UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY;<br><br>MASSACHUSETTS ELECTRIC COMPANY AND NANTUCKET ELECTRIC COMPANY EACH D/B/A NATIONAL GRID; and<br><br>FITCHBURG GAS AND ELECTRIC LIGHT COMPANY D/B/A UNITIL,<br><br>Plaintiffs,<br><br>v.<br><br>H.Q. ENERGY SERVICES (U.S.) INC.,<br><br>Defendant. | Case No.: ________________<br><br>**COMPLAINT** |

Plaintiffs NSTAR Electric Company d/b/a Eversource Energy ("Eversource"), Massachusetts Electric Company and Nantucket Electric Company, each d/b/a National Grid (together, "National Grid"), and Fitchburg Gas and Electric Light Company d/b/a Unitil ("Unitil") (collectively, the "Electric Distribution Companies") bring this action against H.Q. Energy Services (U.S.) Inc. ("HQUS").

## I. NATURE OF THE CASE

1. This dispute arises out of contracts between the Electric Distribution Companies and HQUS for the delivery of clean energy to satisfy the Massachusetts Green Communities Act of 2008 and the Energy Diversity Act of 2016, which HQUS violated almost immediately after its energy-delivery obligations became effective.

2. As required by the legislation, and to advance the Commonwealth's goals of increasing clean-energy supply, improving reliability, and reducing winter price volatility, the

Electric Distribution Companies contracted with HQUS for the annual delivery of 9.45 TWh of "firm" hydropower—meaning delivered on an uninterrupted basis—to the ISO–New England power grid, together with associated environmental credits and other attributes (collectively the "Products") at set prices over a 20-year term.[1]

3. The Power Purchase Agreements ("PPAs") between the Parties require that HQUS supply the power from 62 designated hydroelectric generation facilities owned and operated by its affiliate, Hydro-Québec Production ("HQP"). Another affiliate, Hydro-Québec TransÉnergie ("HQT"), owns and operates the transmission system over which the electricity flows from these facilities to the border of the United States and Canada. There, HQUS takes physical delivery and title to the electricity, and delivers it over a newly constructed transmission line funded by the Electric Distribution Companies to an interconnection point in Lewiston, Maine.

4. The Massachusetts Department of Public Utilities ("DPU") approved the PPAs after a lengthy, contested public process. Throughout the approval process, HQUS repeatedly and emphatically asserted that its clean-energy delivery obligations were firm, and would "act as a hedge against high winter energy prices." Moreover, HQUS stated that it had a long track record of delivering energy into New England without failure but acknowledged that, if it failed to satisfy its delivery requirements under the PPAs, HQUS would pay cover damages per a specific formula in the PPAs to protect the Electric Distribution Companies' customers from seasonal price spikes.

5. The Massachusetts Supreme Judicial Court ("SJC") affirmed the DPU's decision unanimously when project opponents appealed. The SJC's decision emphasized the guaranteed

[1] For point of reference, this electricity is equivalent to approximately 20% of Massachusetts's annual demand.

nature of HQUS's obligations and the applicability of the cover damages provisions to ensure compliance.

6. Further, in its Electric Quarterly Reports, HQUS subsequently represented to the Federal Energy Regulatory Commission ("FERC") that its contractual obligations under the PPAs are "firm."

7. HQUS violated the PPAs after just eight days of operation by cutting off power deliveries into New England over all or parts of 12 days in the middle of winter, from January 24 through 31 and February 6 through 9, 2026.

8. On January 25, 2026, the Electric Distribution Companies immediately notified HQUS of its failure to deliver and invoked the corresponding stipulated damages provisions of the PPAs.

9. Two days later (on January 27, 2026), HQUS's chief operating officer publicly attributed the interruptions to extreme cold and peaking demand in Québec, and he conceded that HQUS would owe cover damages.

10. Three days after that (on January 30, 2026), in letters to the Electric Distribution Companies, HQUS reiterated that the interruptions were because of "extreme weather conditions in Québec" and said it would further "evaluat[e]" and "provide further elaboration in writing on those issues as soon as practicable."

11. HQUS then abruptly changed course. In follow-up letters dated February 11, 2026, HQUS claimed that the interruptions were caused by a Force Majeure—namely, a "Reliability Curtailment"—and rejected the Electric Distribution Companies' invocation of the contracts' cover damages remedy.

12. Under the PPAs, a Reliability Curtailment requires an "order or directive" from the

Interconnecting Utility (i.e., HQT) curtailing delivery of the clean energy to the Electric Distribution Companies in accordance with its Open Access Transmission Tariff ("OATT").

13. None of that occurred here. HQT issued no "order or directive" in accordance with its OATT, as the PPAs require. There was also no "emergency or other unforeseen condition" related to the transmission systems, as the OATT requires. Further, HQUS never complied with the PPAs' Force Majeure notice, documentation, and mitigation obligations.

14. Most troubling, the interruptions were imposed in a discriminatory, discretionary, and non-transparent manner contrary to the OATT and Good Utility Practice. Under HQT's OATT, the firm service associated with supply under the PPAs is entitled to the same priority as native load. Consistent with its OATT and Good Utility Practice (including applicable prioritization principles of the North American Electric Reliability Corporation), service for the PPAs should have remained uninterrupted absent pro-rata curtailment of native load. Instead, in flagrant violation of the PPA and the OATT, that service was cut while native load and other service continued. Additionally, HQT failed to provide the required postings for public notice of its departure from the OATT service standards.

15. It is now evident that the real reason HQUS failed to satisfy its delivery obligations under the PPAs was discretionary and prophylactic: to preserve the Province's supply for local demand during a period of extreme cold in the region. Those circumstances were entirely foreseeable, did not constitute an "emergency" under the OATT or Good Utility Practice (and no emergency was ever declared under HQT's operating procedures), and in no event excused HQUS's non-performance—of firm delivery or payment of stipulated damages to the Electric Distribution Companies—under the express terms of the PPAs.

16. Consistent with the terms of the PPAs, the Electric Distribution Companies have calculated damages and offset them against HQUS's invoices. These damages/offsets amount to approximately $40 million and inure to the benefit of the Electric Distribution Companies' customers. The supporting documentation for the calculations has been provided to HQUS.

17. Notwithstanding its clear contractual obligations and its unexcused (and inexcusable) failures to deliver under the PPAs, HQUS has rejected the Electric Distribution Companies' offsets and has simply rebilled them for the full amount of its invoices, as if it were free to act with impunity.

18. The ramifications of HQUS's flagrant disregard of its firm service obligation extend well beyond the Electric Distribution Companies' customers. As a result of these interruptions, the ISO–New England power grid has been forced to rely on higher-cost, higher-emitting oil-fired generation to meet demand and maintain system reliability, thereby affecting the New England region more broadly.

19. HQUS's conduct and public statements in the months since the interruptions at issue indicate that it (and its Affiliates for which it is responsible under the PPAs) will continue interrupting service under the PPAs in a discriminatory, discretionary, and non-transparent manner, including during the winter periods, and will continue to challenge further claims for stipulated damages and offsets under the PPAs by the Electric Distribution Companies.

20. This dispute presents an actual controversy that is ripe for judicial resolution under 28 U.S.C. § 2201. The Electric Distribution Companies are entitled to, inter alia, a declaration and associated injunction that the HQUS failures to deliver in January and February 2026 were unexcused, that the contractual remedy of stipulated damages applies, that the Electric Distribution Companies' calculations of such damages are accurate, and that the Electric Distribution

Companies are entitled to recover from HQUS and to offset payments made to HQUS now and in a similar manner in the future for unexcused failures to deliver.

21. The Electric Distribution Companies also assert a claim for breach of the implied covenant of good faith and fair dealing because HQUS's past conduct and public statements concerning future delivery interruptions frustrate the very purpose of, and representations made in, the legislatively mandated PPAs: to secure firm "Qualified Clean Energy" over a 20-year period, benefitting New England electric customers by reducing peak-demand-period price spikes, and also reducing the region's reliance on high-emitting fossil-fuel generation.

22. The Electric Distribution Companies seek relief as further explained below.

## II. PARTIES

23. Plaintiff NSTAR Electric Company d/b/a Eversource Energy is an electric-distribution company serving approximately 1.4 million homes and businesses in Massachusetts. NSTAR Electric Company is regulated by the DPU. NSTAR Electric Company is incorporated in Massachusetts and maintains its principal place of business in Massachusetts. It is referred to herein as "Eversource."

24. Plaintiffs Massachusetts Electric Company and Nantucket Electric Company, each d/b/a National Grid, are electric-distribution companies serving approximately 1.4 million homes and businesses in Massachusetts. Both Massachusetts Electric Company and Nantucket Electric Company are regulated by the DPU. Massachusetts Electric Company and Nantucket Electric Company are both incorporated in Massachusetts and maintain their principal places of business in Massachusetts. They are referred to collectively herein as "National Grid."

25. Plaintiff Fitchburg Gas and Electric Light Company d/b/a Unitil is an electric-distribution company serving 31,000 homes and businesses in Massachusetts. Fitchburg Gas and

Electric Light Company is regulated by the DPU. Fitchburg Gas and Electric Light Company is incorporated in Massachusetts and maintains its principal place of business in Massachusetts. It is referred to herein as "Unitil."

26. Defendant HQUS is a trading subsidiary of Hydro-Québec ("HQ"), which is an electric utility wholly owned by the Province of Québec. HQ has guaranteed certain obligations of HQUS relevant to this action.

27. HQUS is incorporated in Delaware and maintains its principal place of business in Connecticut. It markets wholesale power to American buyers, including electric-distribution companies, and holds Market-Based Rate authority from FERC. HQUS's ability to participate in the U.S. energy market is contingent on HQT's (a division of HQ and an affiliate of HQUS) adoption of, and compliance with, an OATT, which is substantively identical to FERC's pro-forma OATT. HQT owns and operates the portion of the transmission facilities in Québec that transmit the Products from the generating facilities to the United States–Canada border. HQP, which is also a division of HQ and an affiliate of HQUS, owns and operates the 62 designated hydroelectric generation facilities in the PPAs.

## III. <u>JURISDICTION AND VENUE</u>

28. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in Massachusetts. Also, HQUS and the Electric Distribution Companies agreed that any legal action or proceeding will be resolved in the courts of the Commonwealth of Massachusetts or a U.S. District Court in the

Commonwealth of Massachusetts, and that each party consents to the jurisdiction of those courts. Exhibits A–C, PPAs §§ 11.1(a), 11.3.[2]

## IV. FACTUAL ALLEGATIONS[3]

### A. The PPAs impose a firm obligation on HQUS to sell and deliver hydroelectric power.

30. In 2016, the Massachusetts General Court amended the Green Communities Act, St. 2008, c. 169, by adding (inter alia) Sections 83B and 83D, which require the Electric Distribution Companies to procure "clean energy." See St. 2016, c. 188, § 12.

31. Section 83D requires the Electric Distribution Companies to jointly procure "clean energy generation" resources through long-term contracts for electricity and associated environmental credits (collectively, "Products").[4] See Pet. of NSTAR Elec. Co. d/b/a Eversource Energy, Nos. D.P.U. 18-64 (Eversource), 18-65 (National Grid), and 18-66 (Unitil), 2019 WL 2717778 (June 25, 2019) (the "DPU Order").[5]

32. That procurement is subject to DPU review and approval, including a finding by DPU that the Electric Distribution Companies' contract guarantees delivery during winter months. Id. at 9; see also Section 83D(d)(5)(vi).

---

[2] The PPAs have been amended multiple times, including to extend certain dates. The amendments are not relevant to the present dispute.

[3] Capitalized terms not defined herein have the meanings given to them in the PPAs.

[4] The PPAs define "Products" to include the clean energy and the "Environmental Attributes," which are environmental credits, certificates, offsets, allowances, and similar benefits, whether existing now or created later, that result from the clean-energy or low-emissions characteristics of power generated by the Hydro-Québec Power Resources, including Qualified Clean Energy. This includes renewable energy credits, GIS certificates, and emissions-related benefits. See Exhibits A–C, PPAs § 1 (Definitions), pp. 5 & 10.

[5] For purposes of Section 83D, the term "clean energy generation" includes "firm service hydroelectric generation from hydroelectric generation alone." DPU Order at *1 n.2 (citing St. 2008, c. 169, § 83B; 220 Code Mass. Regs. 24.02).

33. Section 83D provides that eligible resources include "firm service hydroelectric generation," defined in relevant part as hydroelectric generation "provided without interruption" during periods designated in a long-term contract. DPU Order at *16 (emphasis added) (citing Section 83B and 220 Code Mass. Regs. 24.02); Section 83B (defining "Firm Service Hydroelectric Generation" to mean "hydroelectric generation provided without interruption for 1 or more discrete periods designated in a long-term contract . . .").

34. On or about June 13, 2018, following completion of the solicitation and contract negotiations, the Electric Distribution Companies and HQUS executed the PPAs, subject to DPU approval, to buy firm hydroelectric generated power from HQUS.

35. The PPAs are materially identical. See Exhibits A–C.

**B. The DPU approves the PPAs.**

36. On July 23, 2018, the Electric Distribution Companies petitioned the DPU to approve their respective PPAs. HQUS intervened and filed briefing in support of the Electric Distribution Companies' positions. The DPU approved the PPAs on June 25, 2019. DPU Order.

37. The DPU found the PPAs to be cost-effective and likely to provide "significant net benefits to ratepayers." DPU Order at *56; see id. at *54–56. It found that the PPAs' delivered cost was below forecast market prices over the terms of the PPAs and that the PPAs would also provide reliability and environmental and economic-development benefits. Id. at *56.

38. The DPU also repeatedly recognized the firm nature of Seller's Delivery obligations. See id. at *5, *27–28, *29–34, *40–43. It noted that the PPAs impose "a firm obligation on HQUS to provide qualified clean energy and associated environmental attributes in accordance with a specified delivery schedule." Id. at *5. The DPU further found that, consistent with HQUS's representations in its own briefing, the PPAs required guaranteed monthly deliveries, including in winter, throughout the terms of the PPAs, satisfying the requirements of Section 83D.

Id. at *15–16, *35–36, *38–40; see also H.Q. Energy Services (U.S.) Initial Brief to the DPU at 10–11.

39. The DPU recognized that the PPAs were designed to bring new clean energy to Massachusetts and establish "a level of deliveries below which penalties will be assessed to HQUS." DPU Order at *34.

40. The DPU also recognized the PPAs' environmental benefits and the importance of the associated Environmental Attributes. It found that the delivered hydroelectric energy must be tracked to permit unit-specific accounting and enable the Commonwealth's Department of Environmental Protection to measure progress toward the Commonwealth's Global Warming Solutions Act goals. Id. at *29–30. The record further showed that the proposal was projected to reduce emissions by approximately 36.61 million metric tons of carbon dioxide equivalent relative to the Section 83D base case. Id. at *17. The DPU ultimately found that the firm hydroelectric power delivered under the PPAs would provide "steady" and reliable greenhouse-gas reductions for Massachusetts. Id. at *34.

**C. The SJC affirms the DPU's approvals.**

41. On September 3, 2020, the SJC affirmed the DPU's approvals. NextEra Energy Res., LLC v. Dep't of Pub. Utilities, 485 Mass. 595 (2020).

42. The SJC held that HQUS's obligations to Deliver under PPAs was "firm" in the legal and industry sense of the term and guaranteed: "Regulations promulgated by the [DPU] define firm service hydroelectric generation as 'hydroelectric without interruption for one or more discrete periods designated in a long-term contract . . . .' That description applies here, as [HQUS] will provide the energy guaranteed under the PPAs from the sixty-two specified hydroelectric generating facilities." Id. at 599 n.4 (citation omitted).

43. The SJC further held that the PPAs provide firm service because their limited provisions for curing delivery shortfalls, paying Cover Damages, and suspending delivery during negative pricing periods address unavoidable disruptions, discourage nonperformance, and do not create a right to interrupt service. Id. at 605–10.

44. The Court also explained that a decision by HQUS to sell power to a third party instead of the Electric Distribution Companies would be a breach of the PPAs and not a remediable delivery shortfall. Id. at 600 n.9.

**D. Core obligations of the PPAs.**

45. The PPAs provide that, after the completion of the New England Clean Energy Connect ("NECEC") transmission line between Québec and Maine (which the Electric Distribution Companies also funded) and continuing for a term of 20 years, HQUS must "sell and Deliver," and the Electric Distribution Companies must "purchase and receive," at set prices, a fixed amount of hydroelectric power and associated attributes from 62 specific generating stations of HQP to be transmitted over the NECEC line into New England, in each hour on each day during the 20-year contract. Exhibits A–C, PPAs § 4.1 and PPA exhibits A (facilities), B (schedule), and D (price).

46. Specifically, HQUS must "sell and Deliver" an aggregate of 1,090 MW per hour of energy produced by the hydroelectric facilities listed in each PPA at Exhibit A over the NECEC line throughout the 20-year term, together with related Environmental Attributes. Exhibit B to each PPA is the "Schedule of Guaranteed Qualified Clean Energy to Be Delivered from the Hydro-Québec Power Resources," stating the fixed volume of energy required to be delivered by HQUS in each hour of the 20-year term of the PPA. See Exhibits A–C, PPAs §§ 4.1(a), 4.2(a), and PPA exhibits A–B.

47. The HQUS obligation to "sell and Deliver the Products [i.e., clean energy and Environmental Attributes] . . . are firm and not subject to interruption . . . ." Exhibits A–C, PPAs § 4.1(a).

48. HQUS is required to provide to the Electric Distribution Companies "all right, title and interest in and to the Products." Id. §§ 4.1(a) and (c).

49. Delivery occurs at the southern terminus of the NECEC line. Id. § 4.2(a).

50. The PPAs require that, except in the event of default by the Electric Distribution Companies, HQUS must sell and deliver the Products exclusively to the Electric Distribution Companies during the Term. Id. § 4.1(c). The PPAs further warrant that HQUS has not sold and shall not sell the Products or their associated attributes to any other person. Id. § 7.2(j). Seller's breach of warranty is an event of default under the PPAs. Id. § 9.1.

51. The PPAs require the Electric Distribution Companies to purchase the Products for 20 years at specified prices that escalate annually. Id. § 2.2(b), and PPA exhibit D (Qualified Clean Energy and Environment Attribute Pricing).

**E. Compliance obligations of HQUS and its Affiliates.**

52. The PPAs also require HQUS and its Affiliates to comply with Good Utility Practice, and other applicable requirements. Specifically:

> Compliance With Utility Requirements. To the extent necessary for it to perform its obligations under this Agreement (including without limitation under Sections 3.1, 4.5 and 4.7), Seller shall comply with, and shall cause the Hydro-Québec Power Resources [owned and operated by HQP] and the Québec Line [owned and operated by HQT] to comply with: (i) Good Utility Practice; and (ii) all applicable rules, procedures, operating policies, criteria, guidelines and requirements imposed by ISO-NE, any Transmission Provider, any Interconnecting Utility, Régie de l'Énergie and/or any other regional reliability entity with jurisdiction over the Hydro-Québec Power Resources or the Québec Line . . . .

Id. § 3.5(a); see also id. §§ 3.5(c), (j), (k) & 7.2(g).

**F. Limited bases for excused performance under the PPAs.**

53. An HQUS failure to deliver is excused only in three circumstances: (1) Force Majeure; (2) negative LMP (locational marginal pricing); and (3) Curable Delivery Shortfalls. Id. § 4.1(a), 4.2(a); § 4.3(c). Negative LMP and Curable Delivery Shortfalls are not implicated here.

54. The PPAs define "Force Majeure" in relevant part to include certain events outside the claiming party's control that could not have been avoided through reasonable diligence and that directly prevent performance, as well as certain Reliability Curtailments not caused by Seller or its Affiliates (i.e., Hydro-Québec entities):

> (i) an event: (A) that was not within the control of the Party claiming its occurrence; (B) that could not have been prevented or avoided by such Party through the exercise of reasonable diligence; and (C) that directly prohibits or prevents such Party from performing its obligations under this Agreement . . . or (iv) a Reliability Curtailment that is not caused, in whole or in part, by any act or omission by Seller or any of its Affiliates and that directly prohibits or prevents Seller from performing its obligations under this Agreement.

Id. § 10.1(a).

55. "Reliability Curtailment" is a curtailment resulting from "(a) an emergency condition as defined in the Interconnection Agreements or the ISO-NE Tariff or tariff of another Independent System Operator, if applicable, or (b) any other order or directive of the Interconnecting Utility or the Transmission Provider pursuant to an Interconnection Agreement or tariff." Id. § 1. The PPAs define "Interconnecting Utility" to include "TransÉnergie [HQT] or the utility providing interconnection service for the Hydro-Québec Power Resources to the transmission system of that utility." Id.

56. To excuse performance, the emergency or other unforeseen condition must impact the transmission system in a manner that directly prohibits or prevents delivery of the contracted energy. Id. § 10.1(a)(iv).

57. A Party invoking Force Majeure must give prompt notice describing its nature, extent, expected duration, and anticipated effect on performance, and must update that notice. Id. § 10.1(b).

58. Specifically, the PPAs provide:

> [S]uch performance shall be excused and suspended so long as the circumstances that give rise to such inability exist or would exist if the Party claiming the Force Majeure used Commercially Reasonable Efforts to cure such circumstances, but for no longer period. The Party whose performance is affected shall give prompt notice thereof; such notice may be given orally or in writing but, if given orally, it shall be promptly confirmed in writing, providing details regarding the nature, extent and expected duration of the Force Majeure, its anticipated effect on the ability of such Party to perform obligations under this Agreement, and the estimated duration of any interruption in service or other adverse effects resulting from such Force Majeure, and shall be updated or supplemented to keep the other Party advised of the effect and remedial measures being undertaken to overcome the Force Majeure.

Id. § 10.1(b).

**G. Stipulated damages for unexcused failure to perform under the PPAs.**

59. If HQUS fails to deliver and the failure is not excused (e.g., by Force Majeure), it must pay "Cover Damages" to the Electric Distribution Companies. Id. § 4.3(a) (Failure of Seller to Deliver Products). These Damages are calculated under a specific formula based on the market value of energy and other costs, as described below. Id. § 1, pp. 3 (definition of "Cover Damages") & 12 (definition of "Replacement Price").

60. The PPAs define these Damages broadly to compensate the Electric Distribution Companies for the net costs and losses, which inure to the benefit of their customers.[6] They are not limited to the market price of replacement power. Instead, the definition includes the cost of replacement energy, incremental transmission charges, costs of replacement environmental

---

[6] Under the PPAs, an "Uncured Delivery Shortfall" occurs when Seller fails to Deliver any Products, or any portion thereof, without excuse under the express terms of the PPAs, and does not timely cure that failure as permitted. Exhibits A–C, PPAs § 4.3(a).

attributes, penalties imposed by ISO-NE or others, and other reasonable resulting costs and losses. Id. § 1 (defining "Cover Damages").

61. The Parties agreed these Damages are a fair and reasonable measure of loss because actual damages are difficult or impracticable to calculate:

> Each Party agrees and acknowledges that (i) the damages that Buyer would incur due to an Uncured Delivery Shortfall would be difficult or impossible to predict with certainty, and (ii) it is impractical and difficult to assess actual damages in the circumstances stated, and therefore the Cover Damages as agreed to by the Parties and set forth herein is a fair and reasonable calculation of such damages.

Id. § 4.3(a).

62. HQUS told the DPU that these Damages provisions would create additional economic incentives to deliver, and that the contracts require firm winter delivery. DPU Order at *23, *37.

**H. Netting of payments by the Electric Distribution Companies.**

63. The PPAs also allow netting of mutual payment obligations, including damages calculated thereunder:

> Netting of Payments. The Parties hereby agree that they may discharge mutual debts and payment obligations due and owing to each other under this Agreement . . . on the same date through netting of such monetary obligations, in which case all amounts owed by each Party to the other Party for the purchase and sale of Products during the monthly billing period under this Agreement, including any related damages calculated pursuant to this Agreement, interest, and payments or credits, may be netted so that only the excess amount remaining due shall be paid by the Party who owes it.

Exhibits A–C, PPAs § 5.2(d) (emphasis supplied); see also id. § 5.2(c)(ii) (concerning disputed invoices).

**I. HQUS failed to deliver hydro-power in January and February 2026.**

**i. HQUS's interruptions.**

64. The NECEC line entered commercial operation in late December 2025, and HQUS began delivering energy to the Electric Distribution Companies on January 16, 2026.

65. Between January 24 and January 31, 2026, and again between February 6 and February 9, 2026, HQUS failed to satisfy its Scheduling and Delivery obligations and failed to deliver clean energy as required by the terms of the PPAs.

66. At that time, HQUS's chief operating officer acknowledged that "the utility anticipates paying . . . penalties"[7] associated with the interruptions. Those are the same stipulated damages the DPU recognized as incentives and protections tied to PPA delivery obligations, which inure to the benefit of the Electric Distribution Companies' customers. DPU Order at *32.

**ii. Electric Distribution Companies' responses.**

67. Each of the Electric Distribution Companies notified HQUS of its delivery failures and reserved its right to invoke Cover Damages. True and correct copies of Eversource's January 25, 2026, letter, Unitil's January 30, 2026, letter, and National Grid's January 29, 2026, letter are attached hereto as Exhibits D, E, and F, respectively.

68. Only after the Electric Distribution Companies contacted HQUS regarding the failure to supply did HQUS attempt to justify its actions.

69. On January 30, 2026, HQUS responded that the interruption was "due to extreme weather conditions in Québec and the surrounding areas that are causing a reliability curtailment of resources." A true and correct copy of that letter is attached as Exhibit G.

[7] *See* Benjamin Storrow, Transmission line stopped sending hydropower during Arctic storm, ENERGYWIRE (Jan. 27, 2026), https://www.eenews.net/articles/transmission-line-stopped-sending-hydropower-during-arctic-storm-2/, attached hereto as Exhibit U.

70. On or about February 6, 2026, Eversource and Unitil sent HQUS a statement of the Cover Damages due under the PPAs. Those amounts were due no later than the deadline for the Electric Distribution Companies' next payment to HQUS. True and correct copies of Eversource's February 6, 2026, letter and Unitil's February 6, 2026, letter (without its exhibit) are attached hereto as Exhibits H and I, respectively.

71. On February 11, 2026, HQUS pivoted and asserted that the partial interruption between January 24, 2026, and February 9, 2026, resulted from a Reliability Curtailment caused by Force Majeure under the transmission tariff of HQT, the Transmission Provider for the Québec Line, and therefore claimed that no Cover Damages were owed to the Electric Distribution Companies. A true and correct copy of this letter is attached as Exhibit J.

72. HQUS failed to support its position by providing, inter alia, the relevant orders or directives and demonstrating that the measures taken were actually in accordance with the relevant tariff.

73. On or about February 13, 2026, the Electric Distribution Companies rejected the HQUS Force Majeure claim because the purported notices were not timely and did not provide the information or support required by the PPAs to demonstrate that delivery was actually prevented by an event of Force Majeure. True and correct copies of Eversource's February 13, 2026, letter, Unitil's February 13, 2026, letter, and National Grid's February 13, 2026, letter are attached hereto as Exhibits K, L, and M, respectively.

74. Between February 23, 2026, and March 2, 2026, each of the Electric Distribution Companies exercised its contractual netting rights and deducted, from HQUS's January 2026 invoice, the Cover Damages due. True and correct copies of Eversource's February 23, 2026, letter,

Unitil's February 20, 2026, letter, and National Grid's March 2, 2026, letter (without its exhibit) are attached hereto as Exhibits N, O, and P, respectively.

75. On or about March 24, 2026, the Electric Distribution Companies also offset against HQUS's February 2026 invoice the additional amounts HQUS owed as Cover Damages. True and correct copies of Eversource's March 25, 2026, letter, Unitil's March 24, 2026, letter, and National Grid's March 31, 2026, letter are attached hereto as Exhibits Q, R, and S, respectively.

76. Total offsets for Cover Damages are $39,694,346.

**iii. HQUS rejects Cover Damages and invoice netting**

77. On or about April 17, 2026, HQUS rejected both the Electric Distribution Companies' entitlement to Cover Damages and their calculations, objected to the offsetting against its January and February 2026 invoices, and demanded full payment. A true and correct copy of HQUS's April 17, 2026, letter is attached hereto as Exhibit T.

**J. Electric Distribution Companies are entitled to stipulated damages and netting.**

78. HQUS has attempted to characterize the January–February 2026 interruptions as necessary to protect reliability during extreme winter conditions. But the PPAs do not excuse such a discretionary curtailment by HQUS or its Affiliates.

79. Under the PPAs, a purported Reliability Curtailment excuses performance only if it resulted from an "order or directive" of the Interconnecting Utility (HQT) pursuant to its tariff, and only if the event was not caused, in whole or in part, by any act or omission of HQUS or its Affiliates, including HQ, HQT, or HQP. Exhibits A–C, PPAs § 10.1(b); see id. § 1 (explaining that "a Person shall not be an 'Affiliate' of Seller unless such Person is Hydro-Québec (including, for the avoidance of doubt, a division of Hydro-Québec) or Controlled by Hydro-Québec").

80. The PPAs likewise require HQUS, if it seeks to invoke Force Majeure based on a purported Reliability Curtailment, to provide prompt notice and supporting information sufficient

to establish that a qualifying curtailment actually occurred and prevented delivery. That includes, among other things, (i) the order(s) and/or directive(s) of the Interconnecting Utility [HQT] or the Transmission Provider pursuant to the tariff directing the curtailment; (ii) information regarding the nature, extent, and expected duration of the Force Majeure; (iii) information regarding mitigation efforts undertaken before and after the Reliability Curtailment; (iv) proof of specific Commercially Reasonable Efforts undertaken to alleviate the emergency condition requiring the Reliability Curtailment; (v) evidence that HQUS contracted with its affiliate, HQT, for firm transmission; and (vi) evidence that the curtailment resulted from "force majeure" or "uncontrollable force," as defined under HQT's transmission service agreement or tariff. Id. §§ 1 (defining "Reliability Curtailment"), 10.1(a) & (b).

81. HQUS did not (and cannot) satisfy those requirements for the delivery interruptions that occurred for the 12 days at issue between January 24, 2026, and February 9, 2026. HQUS did not provide the required prompt notice and documentation showing that any qualifying transmission-system curtailment actually prevented delivery of the contracted energy. Nor has HQUS produced any tariff-based order(s) or directive(s), adequate mitigation evidence, or other required support for its claim that the interruptions constituted a Reliability Curtailment.

82. Because those interruptions were not excused by Force Majeure or any other contractual defense, they constituted an Uncured Delivery Shortfall under the PPAs and triggered HQUS's obligation to pay Cover Damages to the Electric Distribution Companies. Id. § 4.3(a).

83. On or about August 17, 2026, the Electric Distribution Companies sent HQUS a notice of dispute under Section 11 of the PPAs regarding the Uncured Delivery Shortfall between January 24, 2026, and February 9, 2026. The parties conferred during the 15-business-day period

required by the PPAs, but were unable to resolve this dispute prior to the end of the period at 5:00 PM ET on September 8, 2026.

**K. HQUS's conduct is ongoing and threatens future interruptions.**

84. HQUS's firm-delivery obligations under the PPAs are long-term and ongoing. The value of the PPAs is based on the uninterrupted delivery of the contracted volume of clean energy throughout the contract term and particularly during the winter season.

85. An HQ representative has publicly stated that HQ will continue to interrupt or curtail the service under the PPAs to support customer demand in Québec.[8]

86. Additionally, HQUS has undertaken additional commitments to supply hydroelectric energy to other markets and customers through new and expanded transmission arrangements, delivering Québec hydroelectric generation outside Québec.

87. One such commitment is the HQUS contract associated with the Champlain Hudson Power Express ("CHPE"), a major transmission line designed to deliver substantial quantities of HQUS electricity into New York. The HQUS agreement with CHPE went into service in May 2026 and represents another significant commitment of hydroelectric resources used to serve HQUS's export obligations. The CHPE agreement lists virtually all of the same hydroelectric generating units that are listed in the Electric Distribution Companies' PPAs.

88. Additionally, electric demand in Québec has continued to increase. This demand, along with significant external supply commitments, further strains HQ's ability to satisfy all of its

[8] Stéphane Rolland, Extreme cold disrupts Hydro-Québec exports to Massachusetts during spike in power use, The Canadian Press (Jan. 30, 2026), https://www.piquenewsmagazine.com/national-news/extreme-cold-disrupts-hydro-quebec-exports-to-massachusetts-during-spike-in-power-use-11814299, attached hereto as Exhibit V.

firm-delivery obligations during periods of high-demand, low-hydrology conditions, outages, or other operational challenges.

89. HQUS's additional commitments increase the risk of future unexcused interruptions under the PPAs. That risk is especially acute here, where HQUS has already demonstrated a failure to meet its firm-delivery obligations under the PPAs in January and February 2026.

90. If discovery reveals that HQUS curtailed deliveries under the PPAs in order for HQP to sell energy to third parties, including affiliated HQUS entities, that conduct would constitute an additional default under the PPAs, and it would further demonstrate the need for equitable relief.

91. Repeated delivery interruptions cause harm beyond immediate replacement-energy cost. They deprive the Electric Distribution Company customers of the benefits that they have paid for in supporting the cost of the new NECEC transmission line and the cost of the PPAs, undermine the long-term reliability and value of the PPAs, increase exposure to winter price volatility, and force greater reliance on higher-emitting fossil-fuel generation to maintain system reliability in winter operations, the very benefits underpinning the DPU's approval of the PPAs.

92. HQUS's expanding external commitments, coupled with its conduct and public statements since the interruptions at issue, indicate that it (and its Affiliates for which HQUS is responsible under the PPAs) will continue interrupting and suspending energy deliveries in a discriminatory, discretionary, and non-transparent manner notwithstanding the Electric Distribution Companies' contractual rights, make this dispute ongoing and prospective in nature. The Electric Distribution Companies therefore require declaratory and related relief to ensure that HQUS will abide by the terms of the PPAs (which provide for firm delivery) and cannot use future

supply pressures or disputed invoice amounts as a basis to withhold the firm deliveries required by the PPAs.

## V. CLAIMS FOR RELIEF

### COUNT 1
### Declaratory Judgment

93. The Electric Distribution Companies incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

94. The PPAs are valid and binding contracts.

95. The Electric Distribution Companies have performed, and continue to perform, all of their material obligations under the PPAs.

96. The PPAs require HQUS to sell and Deliver Qualified Clean Energy under firm-delivery obligations throughout the contract term.

97. The PPAs further require HQUS to sell and Deliver the contracted Products exclusively to the Electric Distribution Companies during the Term and prohibit HQUS from selling or otherwise permitting those Products or their associated attributes to be conveyed or claimed by any other person.

98. From January 24 through January 31, 2026, and February 6 through February 9, 2026, HQUS failed to satisfy its Scheduling and Delivery obligations under the PPAs.

99. No Force Majeure or other contractual condition excused HQUS's nonperformance during that period.

100. An actual and justiciable controversy exists between HQUS and the Electric Distribution Companies. HQUS contends that it owes no Cover Damages. The Electric Distribution Companies dispute that position and contend that HQUS's delivery failures were unexcused and gave rise to Cover Damages under the PPAs.

101. HQUS did not provide the prompt and supplemented notice required by the PPAs or relevant supporting orders or directives pursuant to the tariff and therefore cannot establish excused performance based on Reliability Curtailment.

102. This controversy is actual, substantial, and ripe for adjudication. HQUS's refusal to accept Cover Damages for the unexcused delivery failures has impaired, and continues to impair, the Electric Distribution Companies' contractual rights and causes concrete harm and injury to the Electric Distribution Companies and their customers.

103. The Electric Distribution Companies have a legally cognizable interest in a judicial declaration of their rights under the PPAs. Absent such relief, the Electric Distribution Companies will continue to face uncertainty regarding HQUS's delivery obligations and their right to recover Cover Damages at $39,694,346 for the Delivery Shortfall for the 12 days at issue between January 24, 2026, and February 9, 2026, which inure to the benefit of the Electric Distribution Companies' customers.

104. A declaratory judgment resolving this dispute will serve the interests of judicial economy, provide the parties with a definitive statement of their respective rights and obligations under the PPAs, and prevent further harm to the Electric Distribution Companies and their customers from HQUS's continued repudiation of its duties under the PPAs during the remaining term of these 20-year contracts.

105. The Electric Distribution Companies therefore respectfully request that this Court enter judgment in their favor and against HQUS as follows:

(a) A declaratory judgment pursuant to 28 U.S.C. § 2201 that HQUS's failure to deliver energy consistent with the terms of the PPAs for the 12 days at issue between January 24 through

January 31, 2026, and February 6 through February 9, 2026, was not caused by Force Majeure and was not excused under the PPAs;

(b) A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Electric Distribution Companies are entitled to Cover Damages for those failures;

(c) A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Electric Distribution Companies were entitled to offset and net the Cover Damages against HQUS's January and February 2026 invoices and properly calculated those amounts;

(d) A declaratory judgment pursuant to 28 U.S.C. § 2201 that HQUS may not curtail, suspend, or otherwise withhold future performance based on the Electric Distribution Companies' assertion of Cover Damages or exercise of their contractual offset and netting rights or on any other basis other than the specific excused delivery provisions stated in the PPAs; and

(e) Any such further relief as the Court deems equitable, just, and proper.

**COUNT 2**
**Breach of Contract**

106. The Electric Distribution Companies incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

107. The PPAs are valid, binding contracts between the Electric Distribution Companies and HQUS.

108. The PPAs were intended to secure a firm (uninterrupted), long-term supply of clean hydroelectric energy and associated Environmental Attributes for the Electric Distribution Companies and their customers.

109. The Electric Distribution Companies have performed their material obligations under the PPAs.

110. The PPAs expressly grant the Electric Distribution Companies the right, under specified circumstances, to recover Cover Damages and to offset such amounts against invoices.

111. HQUS was obligated under the PPAs to make firm deliveries of clean energy and associated Environmental Attributes during every hour of the PPA term, including during January and February 2026.

112. HQUS failed to satisfy its delivery obligations in January and February 2026, and those failures were not excused under the PPAs.

113. HQUS also disputed the Electric Distribution Companies' contractual entitlement to Cover Damages and their contractual right to offset such amounts.

114. Any and all conditions precedent to the obligation of HQUS to pay Cover Damages have occurred.

115. In addition, to the extent HQUS contends that it has a right to interrupt, suspend, or otherwise withhold future deliveries based on the Electric Distribution Companies' exercise of their contractual rights, such conduct constitutes a breach of the PPAs.

116. The PPAs also require that HQUS perform its obligations consistent with Good Utility Practice and all applicable requirements. Further, to the extent necessary for HQUS to meet its obligations, including its delivery obligations, HQUS agreed to cause its Affiliates, HQP and HQT, to operate in accord with Good Utility Practice and all applicable requirements.

117. As a direct and proximate result of HQUS's breaches of the PPAs, the Electric Distribution Companies and their customers have suffered and will continue to suffer harm to be determined at trial.

118. The Electric Distribution Companies are entitled to recover all relief available under the PPAs and applicable law, including Cover Damages, and to such further relief as the Court deems just and proper.

**COUNT 3**
**Injunctive Relief**

119. The Electric Distribution Companies incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

120. An actual and justiciable controversy exists concerning whether HQUS may curtail, suspend, or otherwise withhold firm deliveries under the PPAs based on disputed invoice amounts or the Electric Distribution Companies' exercise of their contractual rights to seek, offset, or net Cover Damages.

121. HQUS has already interrupted deliveries under the PPAs and its conduct and public statements indicate that it (and its Affiliates for which HQUS is responsible under the PPAs) will continue to do so in a discriminatory, discretionary, non-transparent manner, and that it will continue to dispute the Electric Distribution Companies' offsets and payment netting.

122. HQUS has also purported to invoke Force Majeure and Reliability Curtailment without providing the notice, substantiation, and contractual support required by the PPAs that demonstrate the existence of conditions that might have prevented delivery of the energy.

123. Unless enjoined, HQUS is likely to repeat that conduct by willfully, intentionally, knowingly, and wrongfully curtailing, suspending, or withholding future energy deliveries.

124. The Electric Distribution Companies and their customers have suffered and will continue to suffer irreparable harm absent injunctive relief. Wrongful interruption of firm deliveries deprives them of the reliable clean-energy supply for which they contracted, frustrates the central purpose of the PPAs, increases reliance on higher-emitting fossil-fuel generation, exacerbates

winter reliability risks, and causes harms that cannot be fully remedied through money damages alone.

125. The Electric Distribution Companies have no adequate remedy at law to prevent future wrongful curtailments and prospective nonperformance. Although the PPAs provide for Cover Damages in certain circumstances, those remedies do not fully redress the ongoing and prospective harms caused by wrongful interruption of firm clean-energy supply.

126. The Electric Distribution Companies are likely to succeed on the merits of their claims that HQUS's January and February 2026 delivery failures were not excused under the PPAs and that their exercise of contractual rights to recover, retain, offset, and net Cover Damages did not constitute a default or material breach.

127. The balance of equities favors injunctive relief because an injunction would require HQUS only to comply with its existing contractual obligations and would prevent HQUS from using this dispute as a ruse to interrupt firm performance obligations or to compel the Electric Distribution Companies to refrain from exercising their contractual rights.

128. Injunctive relief also serves the public interest because the PPAs were entered to secure firm clean energy, improve winter reliability, reduce price volatility, and lessen regional dependence on fossil-fuel generation.

129. The Electric Distribution Companies therefore seek injunctive relief prohibiting HQUS from curtailing, suspending, or otherwise withholding deliveries under the PPAs based on disputed invoice amounts or the Electric Distribution Companies' exercise of their contractual rights, and from wrongfully invoking Force Majeure or Reliability Curtailment as a basis for nonperformance absent compliance with the PPAs' express requirements.

**COUNT 4**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

130. The Electric Distribution Companies incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

131. The PPAs are valid binding contracts between the Electric Distribution Companies and HQUS.

132. Under Massachusetts law, every contract includes an implied covenant of good faith and fair dealing, which requires that neither party do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

133. The PPAs were intended to secure a firm (uninterrupted), long-term supply of clean hydroelectric energy and associated Environmental Attributes for the benefit of the Electric Distribution Companies and their customers.

134. The PPAs expressly give the Electric Distribution Companies the right to recover Cover Damages and to offset such amounts under specified circumstances.

135. HQUS willfully, intentionally, knowingly, and in bad faith failed to satisfy its delivery obligations in January and February 2026, and those failures were not excused under the PPAs.

136. After those delivery failures, HQUS disputed the Electric Distribution Companies' contractual entitlement to Cover Damages and disputed their right to offsets.

137. HQUS's conduct and public statements indicate that it will interrupt, suspend, curtail, or otherwise withhold future deliveries.

138. It would be improper for HQUS to attempt to characterize the Electric Distribution Companies' exercise of their express contractual rights as a default or material breach that would justify HQUS's own nonperformance.

139. It would be improper for HQUS to use these positions to pressure the Electric Distribution Companies to abandon, compromise, or refrain from exercising their express contractual remedies under the PPAs.

140. HQUS's conduct has been and is coercive, commercially unreasonable, and contrary to accepted standards of fair dealing, undermines the central purpose of the PPAs, and frustrates the Electric Distribution Companies' contractual rights and reasonable expectations.

141. To the extent HQUS contends that any limitation-of-remedies provision bars or restricts the Electric Distribution Companies' recovery, that provision is unenforceable as against public policy because it is unconscionable and fails of its essential purpose.

142. As a direct and proximate result, the Electric Distribution Companies and their customers have suffered and will continue to suffer damages and irreparable harm in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against HQUS on Counts 1 through 4, and grant relief, including the following:

A. a declaration that HQUS's failures to satisfy its delivery obligations under the PPAs in January and February 2026 were not caused by a Reliability Curtailment, a Force Majeure event, or any other circumstance excusing performance under the PPAs;

B. a declaration that Plaintiffs are entitled under the PPAs to recover Cover Damages arising from HQUS's delivery failures;

C. a declaration that Plaintiffs properly exercised their contractual rights to retain, offset, and net Cover Damages against amounts invoiced under the PPAs;

D. a declaration that HQUS may not curtail, suspend, or otherwise withhold performance under the PPAs based on Plaintiffs' exercise of their contractual rights to seek, retain, offset, net, or dispute Cover Damages;

E. a declaration that HQUS may not curtail, suspend, or otherwise withhold performance under the PPAs absent Force Majeure as defined by the PPAs supported by written orders or directives from the Transmission Provider, who shall apply any curtailments on a pro-

rata basis where the commitment to the Electric Distribution Companies is on par with native load in Québec;

F. injunctive relief prohibiting HQUS from interrupting, suspending, or otherwise withholding deliveries under the PPAs based on disputed invoice amounts or Plaintiffs' exercise of their contractual rights to seek, retain, offset, net, or dispute Cover Damages;

G. injunctive relief prohibiting HQUS from invoking Force Majeure or Reliability Curtailment as a basis for nonperformance absent compliance with the PPAs' express requirements;

H. injunctive relief declaring that similar discriminatory, discretionary, and non-transparent interruptions by HQUS (and its Affiliates for which it is responsible under the PPAs) are unexcused, entitling the Electric Distribution Companies to future Cover Damages and netting of payments;

I. monetary judgment in an amount to be determined at trial; and

J. such other and further relief as the Court deems just and proper.

Respectfully submitted,

NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY and FITCHBURG GAS AND ELECTRIC LIGHT COMPANY D/B/A UNITIL,

By their attorneys,

*<u>/s/ Christopher J. Cunio</u>*
Christopher J. Cunio (BBO# 634518)
Nicholas D. Stellakis (BBO# 644981)
Natalia Cristina San Juan*
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Tel: (617) 648-2800
Fax: (617) 433-5022
ccunio@hunton.com
nstellakis@hunton.com
nsanjuan@hunton.com

and

MASSACHUSETTS ELECTRIC COMPANY
AND NANTUCKET ELECTRIC COMPANY
EACH D/B/A NATIONAL GRID,

By their attorneys,

*/s/ Shailee D. Sharma*

Jeremy B. Creelan*
Shailee D. Sharma (BBO# 687705)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
JCreelan@jenner.com
SSharma@jenner.com

Laurie J. Edelstein*
JENNER & BLOCK LLP
525 Market Street, 29th Fl.
San Francisco, CA 94105
Tel: (628) 267-6800
LEdelstein@jenner.com

Zachary B. Cohen*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Ste. 900
Washington, DC 20001
Tel: (202) 639-6000
ZCohen@jenner.com

**Pro Hac Vice Application Forthcoming*