UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY;<br><br>MASSACHUSETTS ELECTRIC COMPANY AND NANTUCKET ELECTRIC COMPANY EACH D/B/A NATIONAL GRID; and<br><br>FITCHBURG GAS AND ELECTRIC LIGHT COMPANY D/B/A UNITIL,<br><br>Plaintiffs,<br><br>v.<br><br>H.Q. ENERGY SERVICES (U.S.) INC.,<br><br>Defendant. | Case No.: 1:26-cv-14124-MJJ |

**THE MASSACHUSETTS UTILITIES' OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 4

I. The PPAs fulfill the Legislature's mandate that the Massachusetts Utilities procure "firm hydroelectric generation" to be "provided without interruption." ........................... 4

II. The PPAs require HQUS to deliver firm qualified clean energy—exactly as their title indicates. ........................................................................................................ 5

III. HQUS is obligated to pay Cover Damages if it fails to deliver uninterrupted power without a valid excuse. ........................................................................................ 6

A. The PPAs' Force Majeure excuse is intentionally narrow. .............................................. 6

B. The PPAs provide that HQUS must pay Cover Damages when it interrupts deliveries without a valid excuse. ........................................................................ 7

C. The PPAs also provide that when HQUS fails to pay owed Cover Damages, the Massachusetts Utilities can net the Cover Damages against invoices. ........................... 8

IV. HQUS interrupted power deliveries without a valid excuse. ............................................ 8

V. The Massachusetts Utilities exercise their contractual rights. .......................................... 9

ARGUMENT ........................................................................................................ 10

I. The Massachusetts Utilities state a claim for breach of contract (Count 2). ..................... 10

A. HQUS failed to make required uninterrupted deliveries in January and February 2026. ........................................................................................................ 10

B. HQUS's Force Majeure invocation was unfounded and improper. ...............................11

C. HQUS breached the PPAs by contesting Cover Damages and reinvoicing net payments. ........................................................................................................ 15

D. The Massachusetts Utilities have cognizable damages. ................................................ 16

II. The Massachusetts Utilities stated a claim for breach of the implied covenant of good faith and fair dealing (Count 4). ................................................................ 17

III. The Massachusetts Utilities adequately pled declaratory judgment and entitlement to injunctive relief (Counts 1 and 3). ................................................................... 18

REQUEST FOR ORAL ARGUMENT ........................................................................................................ 20

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bos. Prop. Exch. Transfer Co. v. Iantosca*,
720 F.3d 1 (1st Cir. 2013)....................16

*Flynn v. AK Peters, Ltd.*,
377 F.3d 13 (1st Cir. 2004)....................16

*Geis v. Nestle Waters N. Am., Inc.*,
321 F. Supp. 3d 230 (D. Mass. 2018)....................10

*GNC Holdings, LLC v. Evolve Logistics LLC*,
No. 2:25-CV-1667, 2026 WL 1992134 (W.D. Pa. July 10, 2026)....................15

*H1 Lincoln, Inc. v. S. Washington St., LLC*,
489 Mass. 1 (2022)....................20

*Hernandez-Miranda v. Empresas Diaz Masso, Inc.*,
651 F.3d 167 (1st Cir. 2011)....................13

*In re Herritt*,
No. 23-12160-CJP, 2025 WL 2796449 (Bankr. D. Mass. Sept. 30, 2025)....................13

*Kyndryl, Inc. v. Computer Scis. Corp.*,
No. CV 25-13943-FDS, 2026 WL 2582812 (D. Mass. Sept. 1, 2026)....................17

*Lenn v. Riche*,
331 Mass. 104 (1954)....................13

*Martorana v. Progressive Direct Ins. Co.*,
No. 22-CV-10613-DJC, 2023 WL 2465639 (D. Mass. Mar. 10, 2023)....................19

*In re MOVEit Customer Data Sec. Breach Litig.*,
No. 23-MD-3083-ADB-PGL, 2025 WL 2176590 (D. Mass. July 31, 2025)....................19

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
377 F. Supp. 3d 49 (D. Mass. 2019)....................13

*SPARTA Ins. Co. v. Pa. Gen. Ins. Co.*,
802 F. Supp. 3d 201 (D. Mass. 2025)....................14

*Speakman v. Allmerica Fin. Life Ins.*,
367 F. Supp. 2d 122 (D. Mass. 2005)....................17, 18

*SPI Pharma, Inc. v. Roben Mfg. Co.*,
No. 21-cv-4746 (ZNQ) (DEA), 2023 WL 4197181 (D.N.J. June 27, 2023)....15

*TrailblazHers Run Co. v. Bos. Athletic Ass'n*,
No. 1:24-CV-10950-IT, 2025 WL 871248 (D. Mass. Mar. 20, 2025)....19

**Statutes**

Energy Diversity Act....4

Green Communities Act....1, 4

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
1276 (4th ed. 2026)....13, 14

DPU Order, 2019 WL 2717778, *41....5

FERC Order No. 888....6

## INTRODUCTION

The Massachusetts Utilities[1] filed this case to protect their nearly 3 million customers from H.Q. Energy Services (U.S.) Inc.'s ("HQUS") past, ongoing, and threatened breaches of the parties' Power Purchase Agreements ("PPAs"). These breaches have already caused tens of millions of dollars in losses to Massachusetts customers, and they threaten the Commonwealth's clean-energy goals and the reliability of the grid for the next 20 years.[2]

The PPAs require HQUS to supply fixed amounts of clean hydroelectric energy, representing approximately 20% of Massachusetts's annual electric demand, from designated facilities at set prices on a firm hourly basis over the 20-year term. Doc No. 1 ¶¶ 1-3, 30-31, 45-46. The Green Communities Act ("GCA") required the Massachusetts Utilities to enter into these PPAs in support of the Commonwealth's compliance with the Global Warming Solutions Act. *Id.* The GCA and its associated regulations require that the contracted-for supply of clean energy be "without interruption" and "guaranteed," especially during the winter months when demand peaks. *Id.* ¶¶ 32-33. The goal of the GCA and the PPAs is to enhance the reliability of the power supply, minimize winter price spikes, and reduce greenhouse-gas emissions. *Id.* ¶¶ 2, 21, 40, 128.

The Massachusetts Utilities conducted a competitive solicitation process and awarded the contracts to HQUS. The Massachusetts Department of Public Utilities ("DPU") then held contested hearings regarding the PPAs, thoroughly vetted the key terms, and ultimately approved them. *Id.* ¶¶ 4, 32, 34, 36-40. Project opponents appealed, and the Supreme Judicial Court ("SJC") affirmed

---

[1] The Massachusetts Utilities (also called electric distribution companies) are: NSTAR Electric Company d/b/a Eversource Energy; Massachusetts Electric Company and Nantucket Electric Company, each d/b/a National Grid; and Fitchburg Gas and Electric Light Company d/b/a Unitil.

[2] HQUS executed separate PPAs with each of the Massachusetts Utilities, but each has the same material terms. Doc No. 1 ¶ 35. For brevity, only one is cited herein (Doc No. 1-3). Capitalized terms not defined herein have the meanings given them in the PPAs.

the DPU determination, holding that the PPAs are consistent with the statutory framework and sufficiently robust as to material terms. *Id.* ¶¶ 5, 41-44. During the entire process, HQUS repeatedly and explicitly assured the regulators and the state's highest court that its delivery obligations were in fact firm and that, if HQUS ever interrupted power deliveries to Massachusetts without valid excuse, it would pay liquidated "Cover Damages" to protect the Massachusetts Utilities' customers from energy price spikes caused by the failure to supply.[3] *Id.* ¶¶ 4, 36, 38.

Beginning just eight days into the PPAs' terms, HQUS cut energy deliveries to the Massachusetts Utilities, causing energy prices across New England to spike and forcing the grid to rely on fossil-fuel generation to meet demand—the exact situation the PPAs were designed to avoid. *Id.* ¶¶ 4, 7, 16, 18, 21, 65, 91. Rather than pay the required Cover Damages of approximately $40 million as calculated by the Massachusetts Utilities per the PPAs, HQUS claimed it was completely excused by force majeure. *Id.* ¶¶ 11, 71. But HQUS had no valid basis to claim a "Force Majeure" under the PPAs for any of the interruptions at issue. *Id.* ¶¶ 12-13, 15, 66, 73, 78-82, 99, 112, 135.

Despite the PPAs' requirements and the Massachusetts Utilities' repeated requests, HQUS never substantiated its Force Majeure invocation. *Id.* ¶¶ 72, 101, 122. Initially, HQUS announced that the delivery failures were caused by extreme weather conditions in Québec—an occurrence that HQUS did not <u>and could not</u> claim excused performance under the PPAs. *Id.* ¶¶ 9-10, 53-56, 69, 78. Indeed, in the same breath, HQUS's chief operating officer said publicly that HQUS expected to pay penalties (i.e., "Cover Damages") under the PPAs. *Id.* ¶ 66. Then, 11 days later, HQUS blamed the failures on a "Reliability Curtailment" issued by its affiliate Hydro-Québec

---

[3] "Cover Damages" is the industry-standard term the PPAs use to refer to liquidated damages for unexcused delivery interruptions, calculated pursuant to a specific formula (PPA § 1, applied through § 4.3(a)) that incorporates the market price for replacement power at the time of purchase.

TransÉnergie ("HQT"), supposedly resulting in a "Force Majeure" under the PPAs. *Id.* ¶¶ 11, 71. HQUS did not and cannot substantiate that assertion. *Id.* ¶¶ 12-13, 72, 78-82. HQUS had no valid basis for asserting a Reliability Curtailment for the delivery interruptions. *Id.* ¶¶ 12-13, 15, 73, 81-82, 99. It never provided the prompt and substantiated notice of Force Majeure that the PPAs require. *Id.* ¶¶ 72, 101, 122. Worse, the delivery interruptions imposed by an HQUS Affiliate were done in a discriminatory and non-transparent manner contrary to the Affiliate's Open Access Transmission Tariff ("OATT") and "Good Utility Practice" as defined in the PPAs, frustrating the central purposes of the PPAs. *Id.* ¶¶ 14-15, 21, 121, 124, 135, 140. The Massachusetts Utilities invoked their rights under PPA § 5.2(d) to "net" these Cover Damages against HQUS's invoices. *Id.* ¶¶ 16, 70, 74-76. HQUS responded by reissuing the prior invoices in full, and ultimately filing its own related suit as if it were the aggrieved party. *See id.* ¶¶ 17, 77.

The Massachusetts Utilities filed this action (after the PPA-mandated dispute-resolution process) because HQUS continued to deny that it owed Cover Damages. *Id.* ¶ 83. The Massachusetts Utilities seek declaratory determinations (Count 1) and/or breach of contract rulings (Count 2) that inter alia (1) HQUS's power-supply interruptions in January and February 2026 were without excuse under the PPAs, (2) the Massachusetts Utilities were therefore entitled to Cover Damages per the PPAs, (3) the Massachusetts Utilities were entitled to net those Cover Damages against the invoices that HQUS issued for the electricity it did supply in those months per the PPAs, and (4) the Massachusetts Utilities have been damaged by HQUS's rejection of the contractually provided-for remedies. *See, e.g.*, *id.* ¶ 105. In addition, because HQUS (and/or its Affiliates) stated an intent to continue interrupting service to Massachusetts in the future, regardless of any Force Majeure, to prioritize customer demand in Québec in contravention of HQT's OATT and Good Utility Practice, and because HQUS has continued to dispute the

Massachusetts Utilities' contractual rights to Cover Damages and netting (*id.* ¶¶ 19, 84-92, 115, 121), the Massachusetts Utilities seek a determination that HQUS may suspend, curtail, or withhold future performance only as permitted by the PPAs and that, even when HQUS disputes application of Cover Damages, the Massachusetts Utilities may net those amounts against HQUS's invoices per the PPAs. *See, e.g.*, *id.* ¶ 105.

In a bid to make its Force Majeure declarations unreviewable, HQUS now seeks to dismiss the Massachusetts Utilities' entire complaint. But as shown below, HQUS's arguments do nothing more than mischaracterize the complaint and contest the Massachusetts Utilities' factual allegations, which must be taken as true at this stage of the case. At bottom, the combination of HQUS's motion to dismiss and its motion for partial summary judgment in its related case lays bare HQUS's view—that it is the sole arbiter of its performance under the PPAs and that its assertion of Force Majeure is in the nature of an *ex cathedra* declaration overriding the Massachusetts Utilities' fundamental contractual rights to Cover Damages and netting. But as is plain from the face of the Massachusetts Utilities' complaint, they have pled more than enough to state claims against HQUS for its breaches of the PPAs and for a declaratory judgment, and to obtain injunctive and other relief for the customers they serve. HQUS's motion should be denied.

## BACKGROUND

### I. The PPAs fulfill the Legislature's mandate that the Massachusetts Utilities procure "firm hydroelectric generation" to be "provided without interruption."

The PPAs were developed, heavily negotiated, and ultimately executed to comply with law. Specifically, in 2016 the Massachusetts Legislature required the Massachusetts Utilities to jointly procure "clean energy generation" through long-term contracts for "firm hydroelectric generation," i.e., generation "provided without interruption." Doc No. 1 ¶¶ 31, 33; *see* St. 2008, c. 169 (the GCA); St. 2016, c. 188, § 12 (Energy Diversity Act amending the GCA by adding §§ 83B and

83D). The Massachusetts Utilities awarded the contracts to HQUS after competitive bidding. Doc No. 1 ¶ 34. The DPU reviewed the PPAs in lengthy, contested public proceedings. *Id.* ¶¶ 4, 32, 34, 36-40. Notably, during that public process, HQUS intervened and filed briefing repeatedly and emphatically representing that its clean-energy obligations were firm and would "act as a hedge against high winter energy prices." *Id.* ¶¶ 4, 36. The DPU approved the PPAs, finding, consistent with HQUS's representations and the statutory requirement, that the PPAs impose firm obligations on HQUS to deliver clean energy including during the winter: "the [DPU] finds that the PPAs contain provisions that guarantee energy delivery on a year-round basis, including in winter months." *Id.* ¶ 38; DPU Order, 2019 WL 2717778, *41. The SJC affirmed the DPU decision, citing (inter alia) the guaranteed nature of HQUS's supply obligations. Doc No. 1 ¶¶ 5, 41-44.

## II. The PPAs require HQUS to deliver firm qualified clean energy—exactly as their title indicates.

To fulfill the "firm hydroelectric generation" mandate, the PPAs provide that, for a 20-year term beginning with the energization of the NECEC transmission line between Québec and Maine, HQUS must "sell and Deliver," and the Massachusetts Utilities must "purchase and receive," a fixed amount of power and associated attributes at fixed prices, to be supplied on a firm hourly basis from 62 specific hydroelectric generating stations in Québec. *Id.* ¶¶ 1-3, 30-31, 45-46. The PPAs provide that HQUS's obligations to "sell and Deliver the Products . . . are firm and not subject to interruption except to the extent caused by Force Majeure . . . ." *Id.* ¶ 47. The facilities designated to provide the contracted-for hydropower, the amount of supply HQUS guaranteed to deliver each month, and the fixed prices are set out in PPA Exhibits A (Facilities), B (Guaranteed Qualified Clean Energy), and D (Pricing). *Id.* ¶¶ 45-46. The PPAs are predicated on HQUS's guaranteed, uninterrupted supply except for limited, exceptional circumstances—otherwise, the

arrangement set forth in the PPAs would not make any sense for the Commonwealth and ratepayers from either an economic or environmental perspective.

The PPAs also require HQUS to comply with, and to cause its Affiliates, including HQT, to comply with, "Good Utility Practice" and other applicable requirements. *Id.* ¶¶ 52, 116. HQUS's ability to participate in the U.S. energy market is contingent on Affiliate HQT's adoption of, and compliance with an OATT, which is substantively identical to FERC's pro-forma OATT. *Id.* ¶ 27. Fundamental objectives of the OATT include fair, non-discriminatory, and transparent access to transmission services. FERC Order No. 888. Compliance with the OATT is the *sine qua non* of Good Utility Practice. *See* Doc No. 1 ¶ 14.

## III. HQUS is obligated to pay Cover Damages if it fails to deliver uninterrupted power without a valid excuse.

HQUS must deliver uninterrupted power except where excused. *Id.* ¶ 53. Failure to deliver is excused in three circumstances, the only one of which relevant to this action is the Force Majeure provision. *Id.* That is exactly what is pled in the Massachusetts Utilities' complaint; the Massachusetts Utilities have never said otherwise, and they have not "misread" anything (as HQUS erroneously states, Doc No. 30 at 8, 14, 16).

### A. The PPAs' Force Majeure excuse is intentionally narrow.

The PPAs define "Force Majeure" to include "(iv) a Reliability Curtailment that is not caused, in whole or in part, by any act or omission by Seller or any of its Affiliates and that directly prohibits or prevents Seller from performing its obligations under this Agreement." *Id.* ¶ 54. The term "Reliability Curtailment" is a curtailment resulting from "(a) an emergency condition as defined in the Interconnection Agreements or the ISO-NE Tariff or tariff of another Independent System Operator, if applicable, or (b) any other order or directive of the Interconnecting Utility or the Transmission Provider pursuant to an Interconnection Agreement or tariff." *Id.* ¶ 55. The PPAs

define "Interconnecting Utility" to include "TransÉnergie [HQT] or the utility providing interconnection service for the Hydro-Québec Power Resources ["HQP"] to the transmission system of that utility." *Id.*

Under the PPAs, a party invoking Force Majeure must give "prompt," substantiated notice. *Id.* ¶¶ 57-58, 80. Specifically, the PPAs provide, in pertinent part:

> The Party whose performance is affected [by an asserted Force Majeure event] shall give prompt notice thereof; such notice may be given orally or in writing but, if given orally, it shall be promptly confirmed in writing, providing details regarding the nature, extent and expected duration of the Force Majeure, its anticipated effect on the ability of such Party to perform obligations under this Agreement, and the estimated duration of any interruption in service or other adverse effects resulting from such Force Majeure, and shall be updated or supplemented to keep the other Party advised of the effect and remedial measures being undertaken to overcome the Force Majeure.

*Id.* ¶ 58.

### B. The PPAs provide that HQUS must pay Cover Damages when it interrupts deliveries without a valid excuse.

When HQUS has no valid excuse for delivery interruptions, including when it improperly seeks to excuse delivery by invoking Force Majeure, the Massachusetts Utilities are entitled to liquidated "Cover Damages" and to net those damages against invoices. PPA § 4.3(a) provides that, if HQUS "fails to satisfy any of its obligations to Deliver" the electricity or other products, unless the failure is excused, HQUS "shall pay" the Massachusetts Utilities "an amount for such Uncured Delivery Shortfall equal to the Cover Damages." *Id.* ¶ 59; Doc No. 1-3 at § 4.3(a). The PPAs provide a formula to calculate Cover Damages based on Replacement Price and incremental transmission expenses. Doc No. 1 ¶¶ 59-60. The PPAs state that Cover Damages are a fair and reasonable measure of loss because the Massachusetts Utilities' damages are "difficult or impossible to predict with certainty." *Id.* ¶ 61.

### C. The PPAs also provide that when HQUS fails to pay owed Cover Damages, the Massachusetts Utilities can net the Cover Damages against invoices.

The PPAs allow the Massachusetts Utilities to recover Cover Damages by netting them against HQUS' outstanding invoices. *Id.* ¶ 63. Specifically, the PPAs provide in relevant part that the Massachusetts Utilities "may discharge mutual debts and payment obligations due and owing . . . including any related damages [i.e., Cover Damages] as calculated pursuant [to the PPAs]." *Id.* There are no other qualifiers to the Massachusetts Utilities' rights to net Cover Damages, and no requirement that these be agreed upon or undisputed as HQUS insists (Doc No. 30 at 13). Under the PPAs, the Massachusetts Utilities receive financial compensation for unexcused interruptions "without resorting to litigation"—and that is precisely what the DPU, represented by a Special Assistant Attorney General, told the SJC. *See* No. 1:26-cv-14123-MJJ, Doc No. 38-3 at 44-45.

## IV. HQUS interrupted power deliveries without a valid excuse.

HQUS interrupted delivery of clean energy for 12 days in January and February 2026, immediately after operation began. *Id.* ¶¶ 7, 65. This caused energy prices to spike, forced the power grid to rely on fossil-fuel generation to meet demand and maintain system reliability, and resulted in tens of millions of dollars in losses to Massachusetts customers. *Id.* ¶¶ 4, 7, 16, 18, 21, 91. HQUS failed to provide the Massachusetts Utilities with "prompt," adequate notice that these interruptions were the result of a Force Majeure event that prevented HQUS from delivering energy. *Id.* ¶¶ 72, 101, 122. Indeed, it was only after the Massachusetts Utilities contacted HQUS regarding the delivery failures that HQUS attempted to justify its actions. *Id.* ¶ 68. Specifically, on January 25, 2026, the Massachusetts Utilities sent a letter to HQUS seeking an explanation. *Id.* ¶ 67. At the time, all the Massachusetts Utilities knew was what HQUS's chief operating officer had said to the press: the interruptions were due to extreme winter conditions in Québec (i.e., not

a Force Majeure event under the PPAs), and that HQUS anticipated paying penalties (i.e., Cover Damages). *Id.* ¶¶ 9, 66.

In response, on January 30, 2026—six days after the first of several consecutive days of interruptions—HQUS finally sent the Massachusetts Utilities a short one-page, three-paragraph letter, which essentially reiterated the chief operating officer's public admissions, stating: "[t]he partial interruption of service is due to extreme weather conditions in Québec and the surrounding areas that are causing reliability curtailment of resources." *Id.* ¶ 69; Doc No. 1-9.

On February 11, HQUS sent a second letter, this one barely more than one page and providing only a modicum of information: the transmission provider (HQUS Affiliate, HQT) had ordered "Reliability Curtailment" under the PPAs. Doc No. 1 ¶ 71. However, the letter did not provide a copy of the purported order or related directive or details—indeed, to this day, HQUS still has not provided the contractually required substantiation of the purported Reliability Curtailment. *Id.* ¶¶ 72, 101, 122. These are the only two "notice" letters identified in HQUS's brief (Doc No. 30 at 10, 18). Neither letter cited <u>any</u> other specific basis for Force Majeure under the PPAs. *See id.* ¶¶ 68, 72; Doc No. 1-9; Doc No. 1-12.

**V. The Massachusetts Utilities exercise their contractual rights.**

When HQUS failed to comply with PPA § 10.1(b) and substantiate its claim of Force Majeure, the Massachusetts Utilities exercised their unambiguous rights under PPA § 4.3(a) to Cover Damages of $39,685,181.99 and under PPA § 5.2(d) to net Cover Damages against HQUS's invoices. Doc No. 1 ¶¶ 73-76. HQUS rejected the Massachusetts Utilities' exercise of their contractual rights and simply rebilled the amounts in full. *Id.* at ¶¶ 17, 77. After contractually required confidential settlement discussions, the Massachusetts Utilities filed this action. *Id.* ¶ 83.

## ARGUMENT

### I. The Massachusetts Utilities state a claim for breach of contract (Count 2).

The Massachusetts Utilities pled all essential elements of a contract-breach claim: the PPAs are valid contracts; the Massachusetts Utilities were ready, willing, and able to perform; HQUS breached its duties under the PPAs by interrupting power without excuse, refusing to pay Cover Damages, and reinvoicing the Massachusetts Utilities; and the Massachusetts Utilities suffered harm as a result of the breach. *See* Doc No. 1 ¶¶ 107, 109; *Geis v. Nestle Waters N. Am., Inc.*, 321 F. Supp. 3d 230, 242 (D. Mass. 2018) (elements of breach of contract). HQUS challenges only breach and damages. The complaint alleges facts sufficient to support both elements.

HQUS's breach of the PPAs follows from three straightforward points: HQUS (1) failed to deliver power as required, (2) improperly and baselessly invoked Force Majeure, and (3) refused to pay Cover Damages or accept net payments and reinvoiced the Massachusetts Utilities for the netted amounts. *See id.* ¶¶ 110-114. The complaint pleads extensive facts supporting each point, *see id.* ¶¶ 7, 12-13, 17, 65-73, 77, 81-82, 98-102, 112-14 122, 135, and HQUS's arguments to the contrary are meritless. The complaint also pleads "damages" because (1) HQUS has reinvoiced the Massachusetts Utilities for the Cover Damages, *id.* ¶¶ 77; Doc No. 1-22, and (2) Massachusetts law recognizes that every breach results in at least nominal damages.

#### A. HQUS failed to make required uninterrupted deliveries in January and February 2026.

The complaint pleads that HQUS was obligated to make firm, uninterrupted deliveries of clean energy, Doc No. 1 ¶¶ 4, 45-47, 96, 111, but failed to do so in January and February 2026, *id.* ¶¶ 7, 65. In particular, the Massachusetts Utilities allege that, from January 24 to 31, 2026, and February 6 to 9, 2026, "HQUS failed to satisfy its Scheduling and Delivery obligations and failed to deliver clean energy as required by the terms of the PPAs." *Id.* ¶ 65.

HQUS asserts that the Massachusetts Utilities have no contract claim because the PPAs "expressly permit certain delivery interruptions." Doc No. 30 at 14. But that attacks a strawman: the Massachusetts Utilities do not allege that every interruption is a breach. The factual question is whether HQUS's interruptions here meet the definition of "Reliability Curtailment" Force Majeure in the PPAs, were properly noticed, and, as such, were excused. As shown below, the Massachusetts Utilities allege in detail exactly why HQUS did not and cannot show that the interruptions were excused under the PPAs. Factually, there was no "Reliability Curtailment" (and no other Force Majeure is legitimately at issue), and HQUS's notices of such were facially inadequate. Doc No. 1 ¶¶ 7, 12-13, 65-73, 81-82, 98-101, 112, 122, 135. HQUS disputes these facts, but that does not render the complaint defective.

Moreover, the Massachusetts Utilities' contract claim goes beyond the lack of a "Reliability Curtailment." They have also alleged that HQUS breached the PPAs by failing to ensure that HQT (and other HQUS Affiliates) complied with Good Utility Practice and other applicable requirements, including HQT's OATT. *Id.* ¶¶ 14-15, 116. They allege that HQT's conduct as it relates to the interruptions was contrary to Good Utility Practice and violated its OATT because the interruptions were implemented in a discretionary, discriminatory, and non-transparent manner. *Id.* ¶¶ 14-15. Again, that HQUS disputes these facts does not render the complaint defective.

### B. HQUS's Force Majeure invocation was unfounded and improper.

The complaint details precisely why HQUS's attempt to excuse its interruptions through Force Majeure was unfounded and improper. *Id.* ¶¶ 7, 12-13, 65-73, 81-82, 98-101, 112, 122, 135.

Until now, the only basis for Force Majeure HQUS ever raised was a "Reliability Curtailment."[4] *See* Doc No. 1-12. To establish a Reliability Curtailment under the circumstances

---

[4] In its motion, HQUS for the first time references a separate ground for "Reliability Curtailment" based on "an emergency condition as defined in the Interconnection Agreements or the ISO-NE

here, HQUS must show (1) an "order or directive of the Interconnecting Utility" (i.e., HQUS Affiliate HQT) and (2) that the order was "pursuant to an Interconnection Agreement or tariff." Doc No. 1-3 § 1 (Reliability Curtailment Definition); Doc No. 1 ¶ 55. The PPAs also require HQUS to "provid[e] details regarding the nature, extent and expected duration of the Force Majeure." Doc No. 1-3 § 10.1(b); Doc No. 1 ¶¶ 57-58, 80.

The Massachusetts Utilities repeatedly requested that HQUS "immediately" provide "information in support of its invocation of Force Majeure and a 'Reliability Curtailment.'" *See, e.g.*, Doc No. 1-15. But "HQUS failed to support its position by providing, inter alia, the relevant orders or directives and demonstrating that the measures taken were actually in accordance with the relevant tariff." Doc No. 1 ¶ 72. HQUS's refusal to provide more than bare claims about grid conditions and winter temperatures is enough to support the Massachusetts Utilities' claim.

In addition to alleging what HQUS failed to provide, the complaint also alleges that the purported Reliability Curtailments did not comply with the applicable tariff. Among other things, the complaint alleges that (1) "the interruptions were imposed in a discriminatory, discretionary, and non-transparent manner contrary to the OATT and Good Utility Practice" and (2) deliveries "should have remained uninterrupted absent pro-rata curtailment of native load." *Id.* ¶ 14. The complaint further pleads that "<u>no emergency</u> was ever declared." *Id.* ¶ 15.[5]

---

Tariff or tariff of another Independent System Operator." *See* Doc No. 30 at 12, 17; *see also* Doc No. 1-3 § 1 (Reliability Curtailment Definition). The Interconnection Agreements, ISO-NE Tariff, and tariff of another Independent System Operator are not relevant here. HQUS has never claimed otherwise. Moreover, no emergency condition was ever declared.

[5] HQUS's own reading of the Force Majeure requirements is wrong. It asserts that the PPAs "do[] not include any . . . qualifying language" requiring that a curtailment "directly prohibit[] or prevent[]" performance. Doc No. 30 at 17. But § 10.1(a)(iv) says exactly that: Force Majeure includes only "a Reliability Curtailment . . . that directly prohibits or prevents Seller from performing its obligations under this Agreement." Doc No. 1-3 § 10.1(a)(iv); Doc No. 1 ¶ 54.

HQUS responds by arguing a double negative, that the Massachusetts Utilities "have not sufficiently alleged that [HQUS] was not permitted to invoke Force Majeure." Doc No. 30 at 16-18. HQUS's arguments boil down to three points, each of which is easily addressed.

First, seeking to avoid any review of its Force Majeure declarations, HQUS asserts that the PPAs "do not provide the [Massachusetts Utilities] an avenue for litigating" the merits of Reliability Curtailments "imposed upon [HQUS]" by HQT. Doc No. 30 at 18. But the PPAs expressly address HQT's conduct and preclude HQUS from invoking Force Majeure when a Reliability Curtailment is "caused, in whole or in part, by any act or omission by Seller or any of its Affiliates." Doc No. 1-3 § 10.1(a)(iv); *see also id*. § 1 (expansively defining "Affiliate"). The Massachusetts Utilities, therefore, are entirely within their rights to reject Force Majeure based on a purported Reliability Curtailment by HQT when it is invoked without a proper basis.

Second, HQUS improperly tries to shift the burden onto the Massachusetts Utilities. The Massachusetts Utilities were not required to plead the inapplicability of an affirmative defense such as force majeure. *Nat'l Ass'n of the Deaf v. Harvard Univ*., 377 F. Supp. 3d 49, 68 (D. Mass. 2019) ("A plaintiff is not required to anticipate and plead around affirmative defenses raised by [a defendant].") (citation and quotation marks omitted); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1276 (4th ed. 2026) (plaintiff not required to plead on the subject of an anticipated defense). Force majeure as an excuse for nonperformance is an affirmative defense under Massachusetts law, the burden of showing which rests on HQUS. *See, e.g.*, *In re Herritt*, No. 23-12160-CJP, 2025 WL 2796449, at *10 (Bankr. D. Mass. Sept. 30, 2025) ("The party asserting the application of the [force majeure] clause has the burden of proof."); *Lenn v. Riche*, 331 Mass. 104, 111 (1954) (defendant has burden of proof on force majeure); *see also Hernandez-Miranda v. Empresas Diaz Masso, Inc*., 651 F.3d 167, 176 (1st Cir. 2011) (ordinary

rule does not place on litigant burden of establishing facts peculiarly within the knowledge of opposing party).

The Massachusetts Utilities certainly had no burden to anticipate and plead the inapplicability of every version of the force-majeure defense that HQUS might concoct—including those never raised before. This includes the "event" type of Force Majeure. HQUS erroneously claims it gave the Massachusetts Utilities notice of two versions of Force Majeure under the PPAs, the so-called "Reliability Curtailment" branch of Force Majeure (PPA § 10.1(a)(iv)) and the so-called "event" branch of Force Majeure (PPA § 10.1(a)(i)), and faults the Massachusetts Utilities for "ignor[ing]" the so-called "event" branch, which relates to an event outside a party's control. Doc No. 30 at 16. The Massachusetts Utilities are not ignoring anything. HQUS never claimed its delivery interruptions were the result of an event outside of its control in the documents it cites in support of this assertion. *See* Doc No. 30 at 16 (citing Doc No. 1 ¶¶ 71, 77; Doc No. 1-12; Doc No. 1-22). None mentions an event outside of HQUS's control as a basis for the delivery interruptions. HQUS's new theory is waived (for the reasons below), and the Massachusetts Utilities need not have pled in response to it. 5 *Federal Practice and Procedure*, *supra*, § 1276.

Third, HQUS asserts that the Massachusetts Utilities' contract claim fails because notice is not a condition precedent to invoking Force Majeure and notice was provided. Doc No. 30 at 18-20. But that is not the Massachusetts Utilities' position. HQUS failed to give timely and substantiated notice of the alleged Force Majeure. Doc No. 1 ¶¶ 57-58, 68-73, 80-81, 101, 122. The allegations suffice to plead that the notice failed to comply with the PPAs. *See, e.g.*, *SPARTA Ins. Co. v. Pa. Gen. Ins. Co.*, 802 F. Supp. 3d 201, 221 (D. Mass. 2025) (what constitutes reasonable detail for contractual notice requirement is a question of fact which cannot be determined as a matter of law).

In addition, HQUS's failure to give contractually required prompt notice is fatal to its defense of force majeure—as to both the "Reliability Curtailment" type (for which no prompt notice was given) and the "event" type (for which no notice whatsoever was given). *See, e.g.*, *GNC Holdings, LLC v. Evolve Logistics LLC*, No. 2:25-CV-1667, 2026 WL 1992134, at *4 (W.D. Pa. July 10, 2026) (barring tardy force-majeure claim where contract required "prompt written notice"); *SPI Pharma, Inc. v. Roben Mfg. Co.*, No. 21-cv-4746 (ZNQ) (DEA), 2023 WL 4197181, at *5 (D.N.J. June 27, 2023) (same where clause required notice "as soon as reasonably possible"). The Massachusetts Utilities' allegations that HQUS failed to comply with the PPAs' notice provision—which must be accepted as true for the purposes of this motion—preclude HQUS's assertion of the Force Majeure defense.

In short, the Massachusetts Utilities have pled facts showing exactly what is needed to challenge the propriety of HQUS's Force Majeure invocation: that HQUS's notice was untimely and unsubstantiated, that any Curtailment was in contravention of HQT's OATT, and that HQUS has waived any other grounds for Force Majeure.

**C. HQUS breached the PPAs by contesting Cover Damages and reinvoicing net payments.**

The complaint further alleges that HQUS breached the PPAs by contesting Cover Damages and attempting to claw back the Cover Damages the Massachusetts Utilities netted against invoices for power delivered. Specifically, the Massachusetts Utilities allege that HQUS "claimed that no Cover Damages were owed to the [Massachusetts Utilities]." Doc No. 1 ¶ 71. The complaint alleges that the Massachusetts Utilities calculated Cover Damages and netted them against HQUS's January 2026 and February 2026 invoices. *Id.* ¶¶ 73-74. The Massachusetts Utilities further plead that "[o]n or about April 17, 2026, HQUS rejected both the Electric Distribution Companies' entitlement to Cover Damages and their calculations, objected to the offsetting against its January

and February 2026 invoices, and demanded full payment." *Id.* ¶ 77. These allegations confirm the breach—HQUS failed to deliver the required power; had no valid excuse; and refused to pay Cover Damages or accept the Massachusetts Utilities' net payments.

HQUS counters that the Massachusetts Utilities' contract claim fails because the PPAs do not permit netting of Cover Damages against HQUS's invoices. Doc No. 30 at 20-21. This argument addresses only the method the Massachusetts Utilities used for the payment of Cover Damages, not their right to the Cover Damages. It is wrong in any event. As the Massachusetts Utilities showed in their motion to dismiss HQUS's complaint and opposition to HQUS's motion for partial summary judgment, the PPAs unambiguously permit the Massachusetts Utilities to net disputed Cover Damages against HQUS's invoices. *See* No. 1:26-cv-14123-MJJ, Doc No. 35 at 19-27. HQUS's argument is contrary to the plain language of the agreements as well as the parties' expressed intent, as approved by the DPU and upheld by the SJC.

**D. The Massachusetts Utilities have cognizable damages.**

HQUS argues that the contract claim fails for lack of damages because the Massachusetts Utilities have netted Cover Damages and therefore are in possession of those sums. Doc No. 30 at 21. This fails for several reasons. First, it is settled that "[u]nder Massachusetts law, a person who is injured by a breach of contract has a right to judgment even if the breach caused no harm." *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 23 (1st Cir. 2004). That is "because of the Massachusetts rule that causation of damages is not an element of breach of contract, as a plaintiff is entitled to at least nominal damages upon proving a breach." *Bos. Prop. Exch. Transfer Co. v. Iantosca*, 720 F.3d 1, 11 (1st Cir. 2013). Moreover, the Massachusetts Utilities have pled damages. A central question in this case is whether HQUS breached the PPAs by withholding electricity without valid excuse and failing to pay Cover Damages. The Massachusetts Utilities have been damaged by being denied their contractual rights to Cover Damages and netting, and being forced to litigate, when the

remedy and cure were intended to be, and represented to the DPU and SJC to be, automatic, without the need for litigation. Doc No. 1 ¶¶ 17, 77, 102, 113-114, 136. Moreover, the Massachusetts Utilities allege that the improper delivery interruptions deprived the Massachusetts Utilities and their customers of the reliable clean-energy supply that they contracted for, and forced them to rely on more expensive, higher-emitting fossil-fuel generation, thereby frustrating the central purpose of the PPAs. *Id.* ¶¶ 14-15, 18, 21, 91, 121, 124, 135, 140.

## II. The Massachusetts Utilities stated a claim for breach of the implied covenant of good faith and fair dealing (Count 4).

HQUS makes an undeveloped, one-paragraph argument that the complaint fails to state a claim for breach of the implied covenant of good faith and fair dealing. Doc No. 30 at 22. HQUS weakly asserts that the Massachusetts Utilities failed to allege that the delivery interruptions were intended to provide HQUS with an unfair advantage or to deprive the Massachusetts Utilities of the fruits of the PPAs, when the complaint alleges just that.

Under Massachusetts law, a party may breach the implied covenant of good faith and fair dealing—even if it adheres to the express terms of the contract—by exercising its contractual rights in bad faith or for improper purpose. *See, e.g.*, *Kyndryl, Inc. v. Computer Scis. Corp*., No. CV 25-13943-FDS, 2026 WL 2582812, at *11 (D. Mass. Sept. 1, 2026). Accordingly, a party breaches the implied covenant where it takes unilateral, voluntary action designed to advance its own self-interest while at the same time preventing or hindering the counterparty from reaping substantial benefits of the contract. *Id.*; *Speakman v. Allmerica Fin. Life Ins*., 367 F. Supp. 2d 122, 134, 138 (D. Mass. 2005). That is exactly what the complaint alleges.

The Massachusetts Utilities allege that HQUS failed to deliver the contractually required energy in January and February 2026 without a valid excuse, Doc No. 1 ¶¶ 7, 12-13, 15, 65-73, 98, 101, 112, 122, 135, that the delivery interruptions were imposed in a discriminatory,

discretionary, and non-transparent manner contrary to the OATT and Good Utility Practice, *id.* ¶¶ 14-15, 21, 121, 124, 135, 140, that HQUS thereafter refused either to pay or credit the Massachusetts Utilities Cover Damages on the basis of an improper and unsubstantiated claim of Force Majeure, *id.* ¶¶ 17, 77, 102, 113-114, and that these actions frustrated the central purpose of the PPAs by depriving the Massachusetts Utilities and their customers of the reliable clean-energy supply contracted for, and forcing them to rely on more expensive, higher-emitting fossil-fuel generation, *id.* ¶¶ 14-15, 18, 21, 91, 121, 124, 135, 140. The delivery interruptions were imposed to benefit native load (customers in Québec), contrary to Good Utility Practice and contrary to the curtailment of firm-transmission service provision of the OATT, which requires that there be no interruption unless there was a concomitant, pro-rata interruption of native load as well. *Id.* ¶ 14. These allegations more than sufficiently state a claim for breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Speakman*, 367 F. Supp. 2d at 134, 138 (defendant breached implied covenant where it took unilateral, voluntary action which undermined the financial arrangement contemplated by the contract).

## III. The Massachusetts Utilities adequately pled declaratory judgment and entitlement to injunctive relief (Counts 1 and 3).

The Massachusetts Utilities have adequately pled all requisites for declaratory judgment and for injunctive relief.[6] HQUS's arguments are meritless, mischaracterize the Massachusetts Utilities' allegations, and/or raise disputes of fact which cannot be resolved on a motion to dismiss.

HQUS argues that the declaratory judgment and injunction counts are duplicative of the contract count. Doc No. 30 at 22-23. This is not correct. The contract-breach count seeks redress

---

[6] Regarding Count 3 (Injunctive Relief), the Massachusetts Utilities acknowledge that injunctive relief is not a standalone claim but rather a remedy for Counts 1, 2, and 4, and is indeed contained in the prayer for relief. In any event, for the reasons set forth below, the Complaint adequately states entitlement to the requested injunctive relief.

for HQUS's past conduct—its unexcused failure to deliver energy over 12 days in January and February 2026, its illegitimate assertion of Force Majeure, and its improper rejection of the Massachusetts Utilities' claim for Cover Damages and entitlement to net those Cover Damages. The declaratory-judgment and injunction counts are also forward looking. They seek a declaration of the rights of the parties under the PPAs and a corresponding injunction, to prevent the same breaches from inevitably and repeatedly recurring over the remainder of the PPAs' 20-year term. *Id.* ¶¶ 19, 84-92, 115, 121. These are distinct, not duplicative, remedies. A claim for declaratory judgment premised on the same underlying facts as a claim for breach of contract should not be dismissed where, as here, the declaratory judgment could be useful in preventing successive actions. *See, e.g.*, *Martorana v. Progressive Direct Ins. Co.*, No. 22-CV-10613-DJC, 2023 WL 2465639, at *9 (D. Mass. Mar. 10, 2023); *In re MOVEit Customer Data Sec. Breach Litig.*, No. 23-MD-3083-ADB-PGL, 2025 WL 2176590, at *34 (D. Mass. July 31, 2025).

HQUS argues that the declaratory-judgment and injunction counts are speculative insofar as they seek to prevent this recurrence. Doc No. 30 at 23-24. This amounts to a denial that there will be further breaches. However, a motion to dismiss tests the plausibility of the claims themselves, not the availability of prospective relief in the event that the plaintiff prevails on those claims. *TrailblazHers Run Co. v. Bos. Athletic Ass'n*, No. 1:24-CV-10950-IT, 2025 WL 871248, at *10 (D. Mass. Mar. 20, 2025). In addition, HQUS's argument just highlights factual disputes that cannot be resolved on a motion to dismiss. Based on HQUS's Affiliate's public statements, the Massachusetts Utilities allege that HQUS will continue to interrupt clean-energy supply, will continue to deny Cover Damages, and will continue to assert that the Massachusetts Utilities cannot net Cover Damages against invoices. Doc No. 1 ¶¶ 19, 84-92, 115, 121. HQUS is hard-

pressed to claim that what it has promised to do in the future is speculative today, and even if it could do so, that is an attack on the facts alleged, not the sufficiency of the pleading.

HQUS argues that the Massachusetts Utilities' arguments would rewrite the terms of the PPAs. Doc No. 30 at 24-25. Again, this is not correct. The Massachusetts Utilities seek a declaration that HQUS's interruptions were, on the facts, unexcused; that the Massachusetts Utilities were entitled to Cover Damages; that the Massachusetts Utilities correctly calculated Cover Damages; and that the Massachusetts Utilities were entitled to net those Cover Damages against HQUS's invoices. They also seek a declaration and/or an injunction to bind the parties for the next 19 years.

Finally, HQUS claims that the PPAs' limitation-of-remedies provision bars the remedy of injunction. Doc No. 30 at 26-27. This is incorrect as well. Under Massachusetts law, such a limitation does not apply to intentional conduct, precisely what the Massachusetts Utilities have plausibly alleged here. *H1 Lincoln, Inc. v. S. Washington St., LLC*, 489 Mass. 1, 23 (2022).

## REQUEST FOR ORAL ARGUMENT

The Massachusetts Utilities request oral argument on this motion.

## CONCLUSION

As the Massachusetts Utilities argue in their motion to dismiss and opposition to summary judgment in HQUS's companion case, this Court can and should rule as a matter of law that the Massachusetts Utilities are entitled to net even disputed Cover Damages against HQUS's invoices.

HQUS's motion in this case, though, goes far beyond that limited question and seeks judicial resolution of factual disputes at the Rule 12(b)(6) stage. That is never appropriate. HQUS's motion should be denied.

Respectfully submitted,

NSTAR ELECTRIC COMPANY D/B/A EVERSOURCE ENERGY and FITCHBURG GAS AND ELECTRIC LIGHT COMPANY D/B/A UNITIL,

By their attorneys,

*/s/ Christopher J. Cunio*
Christopher J. Cunio (BBO# 634518)
Nicholas D. Stellakis (BBO# 644981)
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Tel: (617) 648-2800
Fax: (617) 433-5022
ccunio@hunton.com
nstellakis@hunton.com
nsanjuan@hunton.com

and

MASSACHUSETTS ELECTRIC COMPANY AND NANTUCKET ELECTRIC COMPANY EACH D/B/A NATIONAL GRID,

By their attorneys,

*/s/ Shailee D. Sharma*
Jeremy B. Creelan (pro hac vice)
Shailee D. Sharma (BBO# 687705)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
JCreelan@jenner.com
SSharma@jenner.com

Laurie J. Edelstein (pro hac vice)
JENNER & BLOCK LLP
525 Market Street, 29th Fl.
San Francisco, CA 94105
Tel: (628) 267-6800
LEdelstein@jenner.com

Zachary B. Cohen (pro hac vice)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Ste. 900
Washington, DC 20001
Tel: (202) 639-6000
ZCohen@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2026, I electronically filed the foregoing document using the Court's CM/ECF system. Service will be effected on all counsel of record by and through the Court's CM/ECF system.

*/s/ Christopher J. Cunio*
Christopher J. Cunio